IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD WILLIAM HAMLIN, | No. 2:11-cv-00604-JKS |
| Petitioner, | MEMORANDUM DECISION |
| vs. | |
| JAMES YATES, Warden, Pleasant Valley State Prison, | |
| Respondent. | |

Richard William Hamlin, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Hamlin is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Pleasant Valley State Prison. Respondent has answered, and Hamlin has replied. Hamlin has also requested an evidentiary hearing.

## I. BACKGROUND/PRIOR PROCEEDINGS

Following a trial at which Hamlin appeared *pro se* with standby counsel,[1] an El Dorado County jury found Hamlin guilty of torture (Penal Code § 206), making criminal threats (Penal Code § 422), three counts of inflicting corporal injury on his wife (Penal Code § 273.5(a)(1)), and three counts of misdemeanor child abuse (Penal Code § 273a(b)).[2] The El Dorado County Superior Court sentenced Hamlin to life in prison on the torture conviction, the upper term of three years on the criminal threats conviction, and the upper term of four years for each of the

---

[1] Although appearing *pro se*, the record reflects that Hamlin is a former criminal defense attorney.

[2] All references to the Penal Code are to the California Penal Code.

corporal injury convictions, but stayed the sentences on the criminal threats conviction and the three corporal injury convictions.  The trial court also sentenced Hamlin to three consecutive terms of 180 days on each of the misdemeanor convictions.  The Court of Appeal, Third Appellate District, affirmed the conviction in a published decision,[3] and the California Supreme Court denied review on June 10, 2009.[4]  On August 12, 2009, Hamlin, appearing *pro se*, filed a petition for habeas relief in the California Supreme Court, which was denied on February 23, 2011.  Hamlin timely filed his Petition for relief in this Court on February 28, 2011.

The facts underlying Hamlin's conviction are well known to the parties, are recited in the California Court of Appeal decision, and are not necessary to the determination of the Petition. Accordingly, they are not repeated here.

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Hamlin raises four grounds:  (1) juror misconduct (prejudgment of guilt); (2) juror misconduct (consideration of extrinsic evidence); (3) exclusion of Hamlin at a critical stage of the proceedings; and (4) exclusion of defense expert witness.  Respondent does not raise any affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[3] *People v. Hamlin*, 89 Cal. Rptr.3d 402 (Cal. Ct. App. 2009).  The court did find that sentencing Hamlin to the upper term on the criminal threats and corporal injury convictions was error, and remanded for resentencing on those four counts.

[4] On appeal, Hamlin was represented by counsel.

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[5]   The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[6]   The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[7]   Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]   When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[9]   The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[10]   "[A]bsent a specific constitutional

---

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

3

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

---

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[16]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[17]

## IV.  DISCUSSION

### A.    Evidentiary Hearing

Ordinarily, a federal habeas proceeding is decided on the complete state-court record and a federal evidentiary hearing is required only if the trier of fact in the state proceeding has not developed the relevant facts after a full hearing.[18]  Hamlin has not identified any factual conflict that would require this Court to hold an evidentiary hearing to resolve in deciding the issues before it.  The request for an evidentiary hearing is, therefore, **DENIED**.

---

[15] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[18] *Pinholster*, 131 S. Ct. at 1398-99; *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

B.      **Merits**

Ground 1:  Juror Misconduct (Prejudgment of Guilt)

Hamlin contends that one of the juror's expressed a belief in his guilt before all the

evidence was heard.  The Court of Appeal summarized the facts underlying this claim:

1. *Predeliberation Statement*

In support of his new trial motion, [Hamlin] offered a declaration from Juror No. 151, who attested that during the first week of trial, Juror No. 63 stated that he thought that a guilty verdict would be a 'slam dunk . . . a no brainer.'  This statement was made long before the end of testimony and long before the jury began its deliberations."  [Hamlin] argued that this evidence showed Juror No. 63 had prejudged his guilt and was not impartial and unprejudiced.

In response, the People offered declarations from two other jurors who attested that they either did not hear or did not recall hearing any juror make a statement regarding [Hamlin's] guilt or innocence before deliberations. The People also argued that "the jury verdicts in this case fly in the face of this alleged statement since the jury, in fact, returned a number of not guilty verdicts."[19]

After a thorough and well-reasoned analysis, the court rejected Hamlin's argument, holding:

In ruling on this aspect of the new trial motion, the court pointed out that "there is really no context for [Juror No. 63's] remarks other than what . . . (Juror No. 151) said in her affidavit . . . .  And we don't know if he was joking.  We don't know if he was speculating out loud, we don't know if there are any qualifiers like: A guilty verdict would be a slam dunk if there is no other evidence presented.  [¶]  It is just a dangling remark by . . . (Juror No. 63) that is inadequate to show misconduct."  The court also concluded that because Juror No. 12 had voted with the rest of the jurors in "return[ing] seven not guilty charges" and in "not find[ing] great bodily injury allegations of certain specific counts to be true," "it is pure speculation to conclude that those predeliberation remarks indicate he had a preexisting bias that continued throughout the trial and prejudiced the case."

The court also addressed itself directly to Juror No. 151, who was apparently in attendance, and stated, "With all due respect, . . . I think you have a bias or interest in seeing that the new trial motion [is] granted, and in my view your affidavit raises serious credibility problems."  The court went on to discuss how in a supplemental declaration Juror No. 151 claimed essentially that Juror No. 32 "said he had made up his mind about guilt prior to the completion of trial."  The court pointed out that in his own declaration, Juror No. 32 essentially said "he reached verdicts only after

_____

[19] *Hamlin*, 89 Cal. Rptr.3d at 442.

6

discussing the evidence with the other jurors" and "[h]e listened to all the evidence before the verdicts were reached."  The  court said that "insofar as there is a conflict in the affidavits, then regrettably this Court must seriously question the credibility of" Juror No. 151.  The court also noted that Juror No. 151 was "now . . . telling the Court that she was pressured to vote guilty, she would not vote that way now, and she considers a life sentence unfair."  The court questioned Juror No. 151's credibility in light of the fact that "she didn't point out to [the court] that she felt pressure when she affirmed her guilty verdict in court."  The court concluded by saying that "[f]or all these reasons, the Court cannot accept . . . (Juror No. 151's) rendition of the facts about . . . (Juror No. 32[s] ) or . . . (Juror No. 63['s]) remarks or conduct.  And in light of that fact, the defense has not shown either misconduct or prejudice" and "I do not for all those reasons think an evidentiary hearing is warranted or that the claim has been established."

In his opening brief, [Hamlin] argues that No. 63's statement constituted misconduct.  What he fails to address, however, is the fact that Juror No. 151 was the only person who attested to the statement by Juror No. 63, and the trial court expressly refused to accept Juror No. 151's "rendition of the facts" because the court found Juror No. 151 was not credible.

In his reply brief, [Hamlin] addresses this issue for the first time.  Citing *People v. Nesler* (1997) 16 Cal.4th 561, 582, 66 Cal.Rptr.2d 454, 941 P.2d 87, for the proposition that an appellate court "accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence," [Hamlin] argues there was no substantial evidence to support the trial court's finding that Juror No. 151's allegations of misconduct by Juror No. 63 were not credible (assuming the court implicitly made such a finding).

Under California law, "The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court . . . ." (*In re Carpenter* (1995) 9 Cal.4th 634, 646, 38 Cal.Rptr.2d 665, 889 P.2d 985.)  "It is an established principle that the credibility of witnesses and the weight to be given their testimony are matters within the *sole* province of the trier of fact . . . ." (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454, 37 Cal.Rptr.3d 399, italics added.)  "A trier of fact may accept such witnesses as he wishes and reject others." (*Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787, 59 Cal.Rptr. 141, 427 P.2d 805.)  "Where there is conflicting testimony, reviewing courts recognize that the trier of the facts has the better opportunity to judge the credibility of witnesses.  In such a case the trial court's findings of fact, to the extent that they rest upon an evaluation of credibility, should be regarded as *conclusive* on appeal." (*Estate of Fries* (1965) 238 Cal.App.2d 558, 561, 47 Cal.Rptr. 888, italics added.)  "[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citation.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it

cannot rationally be disbelieved." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204–1205, 52 Cal.Rptr.2d 518.)

Here, the trial court—which was the trier of fact for purposes of [Hamlin's] attempt to establish juror misconduct as a basis for a new trial—rejected Juror No. 151's assertion that Juror No. 63 made a statement during the early stages of the trial that showed he had prejudged the case based on what the court characterized as Juror No. 151's "serious credibility problems." The court's credibility assessment was not arbitrary or irrational, but instead was based on the fact that Juror No. 151's declaration conflicted with the declaration filed by Juror No. 32 on various points and on the fact that Juror No. 151 was now taking a position on [Hamlin's] guilt contrary to the way she voted at trial.

[Hamlin] attempts to discount the trial court's reasoning, contending that a careful examination of the declarations shows there was no conflict and that a "change of heart after learning of the severity of [[Hamlin's]] sentence does not provide a rational reason to question [Juror No. 151's] credibility." We are not persuaded on either point.

First, Juror No. 151 plainly asserted in her supplemental declaration that "[a]fter verdicts were reached and just before going into court for the reading of those verdicts, [Juror No. 32] made a blanket apology to the group of jurors, saying that he knew he had been unpleasant to some people and that those people knew who they were. He also said that he had opinions prior to the completion of the trial that he stated and he knew he shouldn't have done that. He said that he had his mind made up 'ahead of time.'" In his declaration, Juror No. 32 just as plainly asserted that he "listened to all of the evidence in this case before forming any opinion as to [[Hamlin]]'s guilt or innocence" and "never expressed an opinion about his guilt or innocence prior to the start of deliberations." Juror No. 32 admitted "apologiz[ing] to the group of jurors early on in deliberations," but specifically denied that the apology was made "right before we went into the courtroom for reading of the verdicts." On these facts, the trial court was entitled to conclude the declarations were in conflict and that Juror No. 151's credibility was therefore subject to question.

Second, on this record the trial court was entitled to conclude that Juror No. 151 was suffering more than simply a "change of heart after learning of the severity of [[Hamlin's]] sentence," as [Hamlin] characterizes it. The trial court could rationally conclude that Juror No. 151 was trying to impeach her own verdict by asserting she was pressured into voting guilty and would not do so again if given the opportunity. Furthermore, the trial court could rationally conclude that Juror No. 151 had "a bias or interest in seeing that the new trial motion be granted" given her expressed view that a life sentence for torture would not be "fair."

[Hamlin] contends that "[i]f the court had questions about Juror No. 151's credibility, that was an issue that could only be resolved at an evidentiary hearing." The authority he cites, however, does not support that proposition. In *People v. Hedgecock* (1990) 51 Cal.3d 395, 272 Cal.Rptr. 803, 795 P.2d 1260, our Supreme Court held that "when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary

hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id.* at p. 415, 272 Cal.Rptr. 803, 795 P.2d 1260.) Thus, it is within the trial court's discretion to determine whether an evidentiary hearing is necessary, even when there are conflicts in the declarations. Here, the trial court determined that an evidentiary hearing was not necessary, and [Hamlin] has shown no abuse of discretion in that determination.

Finally, [Hamlin] argues that reviewing courts defer to credibility determinations by trial courts in ruling on issues of juror misconduct only "because the 'trial court [is] in the best position to observe [the juror's] demeanor,'" and therefore "there is no reason to give deference to credibility determinations that did not result from an actual hearing." [Hamlin] does not cite any authority establishing that deference to the trial court's credibility determinations is justified only when there has been an evidentiary hearing in which live witnesses testify. Regardless of whether Juror No. 151 took the witness stand, the trial court was indisputably in a better position than we are to assess her demeanor, in that the trial court had the opportunity to observe her not only throughout trial, but also at the hearing on [Hamlin's] new trial motion, where the court directed comments directly to her. In any event, even if we did not defer to the trial court's credibility determination, we would nonetheless agree with the court that the conflict in the jurors' declarations and Juror No. 151's "recantation and inconsistent positions" regarding [Hamlin's] guilt provided a rational basis for the court to find that Juror No. 151's assertion regarding the statement made by Juror No. 63—which no other juror verified—was not sufficiently credible to warrant a finding of misconduct. Consequently, we find no error in the trial court's denial of the new trial motion on this basis.[20]

Assuming *arguendo* that Hamlin's claim involving a juror's pre-deliberation statement is cognizable in this Court not withstanding Court Federal Rule of Evidence 606,[21] Hamlin misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction. This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. Where, as in this case, the question is one of credibility, the finding of

---

[20] *Id.* at 442-45 (emphasis in the original).

[21] This Rule is discussed further below with respect to the second ground.

the trier-of-fact carries the day.[22]   Under *Jackson*, the role of this Court is to simply determine

whether there is any evidence, if accepted as credible by the trier-of-fact, sufficient to sustain the

finding.[23]   In this case, the California Court of Appeal determined that there was insufficient

evidence to establish that the juror in question had, in fact, impermissibly prejudged Hamlin's

guilt.  Although it might have been possible to draw a different inference from the evidence, this

Court is required to resolve that conflict in favor of the prosecution.[24]   Hamlin bears the burden

of establishing by clear and convincing evidence that these factual findings were erroneous;[25] a

burden Hamlin has failed to carry.  The record does not compel the conclusion that no rational

trier of fact could not have found that the juror in question had not prejudged Hamlin's guilt,

especially considering the double deference owed under *Jackson* and AEDPA.  Hamlin is not

entitled to relief under his first ground.

Ground 2:  Juror Misconduct (Consideration of Extrinsic Material)

Hamlin alleges two instances of juror misconduct.  In the first instance a juror conducted

an unsuccessful internet search of the term "great bodily injury."  In the second, the bailiff

refused a juror request for permission to take a legal dictionary into the jury room.  The trial court

declined to grant a new trial and the Court of Appeal affirmed.

A.      **Internet Search**

The Court of Appeal summarized the facts underlying this claim:

---

[22] *See Bruce v Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

[23] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[24] *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979).

[25] 28 U.S.C. § 2254(e)(1).

2. *Online Search*

In support of his new trial motion, [Hamlin] offered the declarations of three jurors who attested that during deliberations Juror No. 63 told his fellow jurors that he had performed an online search for definitions of "great bodily injury" but came up with no information as a result of the search.  The trial court found that Juror No. 63 committed misconduct by doing the online search, but also noted that it was "undisputed that no information was conveyed to . . . the other jurors" and there was "no . . . affirmative evidence that . . . (Juror No. 63) learned anything himself." Because the court concluded it was "pure speculation that he did learn anything," the court concluded the presumption of prejudice arising from the misconduct was "rebutted here."

On appeal, [Hamlin] contends the trial court erred in finding the presumption of prejudice was rebutted.  [Hamlin] argues that once the court found misconduct, the "presumption of prejudice could be rebutted only by proof that no prejudice actually resulted.  The court could not deny relief by finding the issue of prejudice too speculative."[26]

The Court of Appeal also rejected this argument, holding:

We find no error.  "As a general rule, juror misconduct 'raises a presumption of prejudice . . . .'" (*In re Hitchings* (1993) 6 Cal.4th 97, 118, 24 Cal.Rptr.2d 74, 860 P.2d 466.)  "This presumption of prejudice '"may be rebutted by an affirmative evidentiary showing that prejudice does not exist *or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct] . . . .'"" (*Id.* at p. 119, 24 Cal.Rptr.2d 74, 860 P.2d 466, italics added.)

Here, the only evidence before the trial court was that while Juror No. 63 attempted to find a definition of "great bodily injury" online, he came up with no information.  This fact itself tends to rebut the presumption of prejudice because it supports the reasonable conclusion that no actual harm occurred from the search because no information was actually received from an extraneous source as a result of the search.

[Hamlin] argues that "[u]nless a computer crashes before the search can go through, it is impossible to conduct an internet search of 'great bodily injury' and obtain no results at all."  Thus, in [Hamlin's] view, despite Juror No. 63's assertion to the other jurors that he came up with no information, he "must have looked at something," and because "[t]he People failed to show what he actually found," the presumption of prejudice was not rebutted.

We are not persuaded.  "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial.  The verdict will be set

---

[26] *Hamlin*, 89 Cal. Rptr.3d at 445.

aside only if there appears a substantial likelihood of juror bias.  Such bias can appear in two different ways.  First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.  [Citations.]  Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant.  [Citation.]  The judgment must be set aside if the court finds prejudice under either test."  (*In re Carpenter, supra,* 9 Cal.4th at p. 653, 38 Cal.Rptr.2d 665, 889 P.2d 985.)

Here, we cannot say that some unknown information Juror No. 63 may have seen while conducting an online search for a definition of "great bodily injury" is substantially likely to have influenced him in a manner detrimental to [Hamlin].  Likewise, we cannot say that the nature of the misconduct—an attempt to find a definition for a term [Hamlin] himself admits has no special legal meaning—viewed in light of the surrounding circumstances—including Juror No. 63's statement to other jurors that he came up with no information as a result of the search—suggests a substantial likelihood that Juror No. 63 was actually biased against [Hamlin].

For the foregoing reasons, we conclude the trial court did not err in finding the presumption of prejudice was rebutted and in denying [Hamlin's] new trial motion on this basis.[27]

## B.    Use of Dictionary

The Court of Appeal also summarized the facts underlying this claim:

3.   *Attempted Use Of Dictionary*

In support of his new trial motion, [Hamlin] offered the declaration of a defense investigator, who attested that she had spoken with Juror No. 32, who told her that "he brought a regular or legal dictionary with him to court for use in deliberations" and "asked the bailiff if he could bring the dictionary into the jury room and was told he could not do that" so he "put the dictionary back in his jacket pocket."

In his own declaration, Juror No. 32 admitted that "[a]t the beginning of deliberations [he] asked a bailiff if it would be appropriate to have a dictionary in the jury room.  [He] was told it would not be appropriate and the dictionary was never used."

The trial court found that what Juror No. 32 did was improper, but because he "never used the dictionary" and "[n]o other juror says he brought forth any other information that he may have gained outside court," it was "minor or trivial misconduct" that "clearly does not show any prejudice or the presumption of prejudice is rebutted."

---

[27] *Id.* at 445-46 (emphasis in the original).

On appeal, [Hamlin] asserts that Juror No. 32's declaration "did not identify the actual dictionary that he tried to take into the deliberation room" and "does not state th[at] he himself did not up look up [a] definition," "[a]nd if he did . . ., it is impossible to determine from the record the actual definition that he looked at." Based on this, [Hamlin] apparently contends the presumption of prejudice was unrebutted.[28]

The Court of Appeal rejected Hamlin's position, holding:

> [Hamlin] is mistaken. Even assuming that evidence a juror *tried* to bring, but did not succeed in bringing, a dictionary into the deliberation room constitutes evidence of juror misconduct, the record here rebuts any presumption of prejudice. It is undisputed that upon being told he could not use the dictionary, he made no attempt to use it.  Accordingly, he received no information from an extraneous source, and there is no reasonable probability of actual harm to [Hamlin].[29]

This Court's analysis starts with Federal Rule of Evidence 606(b):

**(1)** ***Prohibited Testimony or Other Evidence.***  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
**(2)** ***Exceptions.*** A juror may testify about whether:
    **(A)** extraneous prejudicial information was improperly brought to the jury's attention;
    **(B)** an outside influence was improperly brought to bear on any juror; or
    **(C)** a mistake was made in entering the verdict on the verdict form.

Suffice it to say that the Supreme Court has never held that an *unsuccessful attempt* to acquire or bring to the jury's attention extraneous information constitutes a violation of due process.  The Supreme Court has noted:  "We have generally analyzed outside intrusions upon the jury for prejudicial effect."[30]

---

[28] *Id.* at 446-47.

[29] *Id.* at 447 (emphasis in the original).

[30] *United States v. Olano*, 507 U.S. 725, 738 (1993).

By the beginning of this century, if not earlier, the near universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict.  [Citation omitted].

Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence," *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), was alleged to have affected the jury.  In *Mattox,* this Court held admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence. The Court allowed juror testimony on influence by outsiders in *Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (bailiff's comments on defendant), and *Remmer v. United States,* 347 U.S. 227, 228-230, 74 S.Ct. 450, 450-452, 98 L.Ed. 654 (1954) (bribe offered to juror).  See also *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (juror in criminal trial had submitted an application for employment at the District Attorney's office).  In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict.  *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Hyde v. United States,* 225 U.S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912).[31]

In reviewing state court determinations on the prejudicial effect of extraneous matters involving the jury, the Supreme Court has held:

Nevertheless, the factual findings arising out of the state courts' post-trial hearings are entitled to a presumption of correctness.  [Citation omitted]  The substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts.[32]

Based upon the record before it, this Court cannot say that the decision of the California Court of Appeal finding a lack of prejudice was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence

---

[31] *Tanner v. United States*, 483 U.S. 107, 117 (1987).

[32] *Rushen v. Spain*, 464 U.S. 114, 120 (1983).

presented in the State court proceeding."[33]  Nor, viewing the matter in the light of *Spain-Tanner-Olano* through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Hamlin's case; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Hamlin is not entitled to relief under his second ground.

Ground 3:  Exclusion of Hamlin From a Part of the Trial

As noted above, a juror asked the bailiff if he could take a legal dictionary into the jury room.  The bailiff replied he could not.  Although the bailiff informed the trial court of this exchange, this fact was not revealed to Hamlin or his standby counsel until after the verdict was rendered.  Hamlin contends that failing to timely bring this to the attention of the defense constituted was error.  The Court of Appeal recited the background for this claim:

> In a supplemental new trial motion, [Hamlin] argued the trial court committed legal error because the trial court did not notify or advise the defense about the dictionary incident when it happened.  At the hearing on the motion, the court admitted "that was a mistake on my part . . . .  I should have brought it to your attention . . . .  But since there was nothing that affected the verdict as a result of my mistake, I think it was harmless error on my part."
> On appeal, [Hamlin] contends the trial court's failure to advise the defense that Juror No. 32 had requested permission to bring a dictionary into the deliberation room was error from which a strong presumption of prejudice arises, and "[b]ecause the presumption of prejudice has not been rebutted, [he] is entitled to a new trial."[34]

The Court of Appeal rejected Hamlin's argument:

> We are unpersuaded.  In *People v. Hogan* (1982) 31 Cal.3d 815, 183 Cal.Rptr. 817, 647 P.2d 93 (the case on which [Hamlin] primarily relies), our

---

[33] 28 U.S.C. § 2254(d).

[34] *Hamlin*, 89 Cal. Rptr.3d at 447.

Supreme Court concluded that the defendant "was denied the right to counsel when the trial judge, without notifying counsel, responded to jury requests to see various trial exhibits during deliberations." (*Id.* at p. 848, 183 Cal.Rptr. 817, 647 P.2d 93.) The court further noted that "if the denial of the right to counsel during jury deliberations may have affected substantial rights of a defendant, prejudice is presumed and '[o]nly the most compelling showing to the contrary will overcome the presumption.'" (*Id.* at p. 849, 183 Cal.Rptr. 817, 647 P.2d 93.)

This case is distinguishable from *Hogan.* In *Hogan,* it was clear that the denial of the right to counsel affected the substantial rights of the defendant because the trial court sent all of the requested exhibits to the jury room, including a tape recording that included "inadmissible and highly prejudicial material concerning [the defendant]'s reluctance to take a lie detector test [that] would never have reached the jury" otherwise. (*People v. Hogan, supra,* 31 Cal.3d at pp. 844–845, 850, 183 Cal.Rptr. 817, 647 P.2d 93.) Thus, the presumption of prejudice was entirely justified (and unrebutted). Here, on the other hand, [Hamlin] does not attempt to explain how the trial court's failure to contact the defense affected his substantial rights, when by the time the court first learned of the matter the bailiff had already told the juror he could not use a dictionary, and the juror did not, in fact, use it. Under the circumstance of this case, as opposed to those in *Hogan,* we see no basis for presuming prejudice.

This case is more akin to *People v. Garrison* (1989) 47 Cal.3d 746, 254 Cal.Rptr. 257, 765 P.2d 419 than it is to *Hogan.* In *Garrison,* the trial court responded to a jury request for the rereading of a defense witness's testimony without consulting with defense counsel, whom the court was unable to locate. (*Id.* at p. 783, 254 Cal.Rptr. 257, 765 P.2d 419.) On the defendant's claim that he was denied the right to counsel, the Supreme Court pointed out that the testimony in issue was unquestionably favorable to the defendant and wrote, "It defies imagination to believe that any defense counsel would have disapproved of the jury rehearing the testimony of this very favorable witness. The trial court was undoubtedly aware of this when it granted the jury's request for the reread. Under the strictest test of prejudice, any error in rereading the . . . testimony in the absence of counsel is harmless beyond a reasonable doubt." (*Ibid.*)

The same can be said here: It defies imagination to believe that any defense counsel would have disapproved of what the bailiff told the juror—that he could not bring the dictionary into the deliberation room. Thus, any error was harmless even under the strictest test of prejudice.[35]

Initially, it is noted that on direct appeal, Hamlin presented it in terms of denial of the

right to counsel, while before this Court he terms it as a denial of his right to counsel *and* his

---

[35] *Id.* at 447-48.

right to be present at critical stages of the proceeding.  Despite the differing semantical nuances, irrespective of how it is termed, the precise question is the same:  did the failure to immediately inform Hamlin and his standby counsel of the juror's request deny him constitutional due process?

It is uncontested that the trial court had an obligation under California law to bring this matter to the attention of the defense.  Thus, the sole issue before both the California courts and this Court is whether this failure was prejudicial.  Before this Court may grant relief, it must find that any constitutional error was not harmless.  Specifically, under *Brecht*,[36] the Court must find that the error "had substantial and injurious effect or influence in determining the [outcome]."[37] This standard is more forgiving standard of review that the *Chapman*[38] "beyond a reasonable doubt" standard.[39]  The determination by a state court that a constitutional error is harmless is itself subject to the unreasonableness test of AEDPA.[40]  The State, rather than the petitioner bears the risk of doubt in a *Brecht* harmless error analysis.[41]  Thus, the state must provide the Court with a "fair assurance" that there was no substantial and injurious effect on the verdict.[42]  That

---

[36] *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

[37] *Id.* at 622; *see Fry v. Pliler,* 551 U.S. 112, 121 (2007) (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

[38] *Chapman v. California*, 386 U.S. 18, 24 (1967).

[39] *Fry*, 551 U.S. at 116.

[40] *Fry*, 551 U.S. at 119-20.

[41] *See O'Neal v. McAninch*, 513 U.S. 432, 439 (1995).

[42] *See Valerio v. Crawford*, 306 F.3d 742, 762 (9th Cir. 2002) (en banc); *see also O'Neal,* 513 U.S. at 443 ("the State normally bears responsibility for the error that infected the initial trial").

does not, however, relieve Hamlin of his burden of proving entitlement to relief by a preponderance of the evidence.[43]

In his briefing before the Court of Appeal, Hamlin's argument was simply that a "strong presumption of prejudice" existed, citing the California Supreme Court decision in *Hogan*. As the Court of Appeal noted, Hamlin made no attempt to explain or argue how he was prejudiced.[44] In his petition for review before the California Supreme Court, Hamlin did contend that the trial court's error denied him "the opportunity to request an immediate inquiry into the issue of juror misconduct, to request admonition against juror misconduct, and to suggest clarifying instructions on points of law that jurors may have been confused about."[45]

In his Petition to this Court Hamlin presents numerous facts not presented to the California appellate courts. Hamlin does, however, present similar hypotheses as to what the defense *might* have done if it had been informed, i.e., question the juror, make unspecified motions, ask for a mistrial or to have the violating juror removed, and to admonish the jury and ask it if it had any impact on them. The problem this Court faces is twofold in that Hamlin: (1) did not argue before the California Court of Appeal what his defense might have done; and (2) does not address what facts would have supported any of the motions he suggests he might have made, or that there was any reasonable likelihood that those motions would have been granted.

---

[43] *Pinholster*, 131 S. Ct. at 1398; (citing *Viscotti*, 537 U.S. at 25); *Silva*, 279 F.3d at 835; *see Bartholomew*, 516 U.S. at 8 (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[44] Lodged Doc. No. 1 at 56-57; Lodged Doc No. 3 at 19.

[45] Lodged Doc. No. 5 at 30.

Because Hamlin did not make even a prima facie showing of actual prejudice, this Court cannot say that the decision of the California Court of Appeal holding that the error was harmless was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[46] Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter* in the light of *Brecht-Fry*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Hamlin's case; i.e., the state court determination that any error was harmless was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Hamlin is not entitled to relief under his third ground.

Ground 4:  Exclusion of Defense Expert Testimony

Hamlin contends that the trial court erred in declining to permit him to introduce the testimony of a handwriting expert.  The Court of Appeal summarized the factual basis underlying this claim:

> S. [Hamlin's wife] testified that [Hamlin's] story about the molestation "changed on a daily basis" and that to keep up with the changes she would make notes. At one point, she said that [Hamlin] "would dictate and make me write notes as he was reading through these books."
>
> During [Hamlin's] case, the prosecutor told the court outside the presence of the jury that she was going to challenge an expert witness [Hamlin] intended to call to testify that S.'s writings did not show any signs of stress or duress.  After hearing initial arguments on the matter, the court decided it would hold an Evidence Code section 402 hearing on the admissibility of the testimony.
>
> At that hearing, Marcel Matley testified that he had been an examiner of documents and handwriting since 1985.  Matley testified that his experience embraced "[a]lmost every aspect of document examination," including whether the writing "show[s] influence of something that was happening at the time it was

---

[46] 28 U.S.C. § 2254(d).

writ[ten]."  Matley testified that while he had qualified as an expert witness "either 71 or 72 times in courts of law," he had qualified only once as an expert on handwriting stress analysis, although he had testified on that issue in at least three other cases.

In explaining the theory behind handwriting stress analysis, Matley said that while some people are not affected by threats, others feel threatened, and the resulting stress manifests itself in the tightening of muscles, which can inhibit the person's writing.  This can result in slower writing with heavier pressure and less continuity.  The letters and the spaces between them become narrower, and the spaces between lines (on unlined paper) might become narrower also.

To determine whether a particular writing shows signs of being written under stress, Matley compares it to other writings by the same person.  If all the writings appear the same, then it may simply be the person's "habit to write stressfully." Matley explained that in doing his analysis, "ideally [he] ha[s] a set of writings that everyone agrees are normal."

At the conclusion of his direct examination of Matley, [Hamlin] offered an exhibit that contained three documents written by S. that Matley had examined for signs of stress.  Matley later explained that he had been told it was disputed as to whether the three documents were written under stress, in other words, there was no agreed-upon "normal" writing sample.

Matley admitted that if a person was chronically under stress, it would be "beyond the expertise of a forensic handwriting examiner" to determine whether a particular writing was written under stress or duress because "it is something chronic, habitual; it is not an acute thing."

On examination by the court, Matley stated that because he did not have an agreed-upon normal writing sample, his opinion would address "[t]he degree of spontaneity versus stress and then a balance between the two" as to all three documents.

Following Matley's testimony, the prosecutor argued that stress analysis was "not an accepted practice or science" and "there's nothing to back it up."  [Hamlin] argued that his testimony should be allowed because Matley had compared the 15 pages of "writings that have been referenced by [S.] . . . as being written during this time period when [[Hamlin]] was allegedly forcing her to write diaries about the issue in question during that time period" with "the Lisa Taylor letter where she wanted to get out of prostitution, get out of the cult movement, get out of the incest and was breaking away" and with "a journal" S. wrote "for Detective Strasser" "after [[Hamlin's]] arrest." According to [Hamlin], Matley would testify that "there was no stress or duress" in the writings from the time period when he was allegedly "forcing her to write diaries," that the Lisa Taylor letter was "a normal writing," and that the journal S. wrote for Detective Strasser was "the one document that she is extremely stressed in."

In ruling on the issue, the court first expressed concern that Matley "spends 80 to 90 percent of his time I.D.'ing who the particular writer of a document was." As for handwriting stress analysis, the court was concerned that Matley had "very

few cases where he's testified as an expert" and "if you don't have a known sample which you can clearly say was written under no stress or duress, I don't see how there's much validity to the conclusion." The court later explained in more detail that "unless you do have a clean sample where you can say this is a pristine example of someone who wrote a document not under stress" and all the expert can say is "this looks like it is written under more stress, this least stress," "[h]ow is that going to help the jury in the ultimate resolution?" The court then expressed concern about the validity of handwriting stress analysis as a discipline, saying, "That all does sound like hocus-pocus to me."

At [Hamlin's] request, the court allowed Matley to be recalled to the stand. Matley explained that he does not need a "clean sample" to determine whether a writing appears to have been written under stress. Instead, he asserted he could look at a writing and determine from that writing alone whether it "has the elements . . . the person's uptight while they're writing." The purpose of using a sample of "normal" writing for comparison is to see if the stress is "outside the norm." Matley then explained his conclusions about the writing samples from S. He concluded the 15 pages were "characterized by spontaneity" and he did not "find any aspects of these documents being written under stress or duress." He concluded the Lisa letter was "[n]either characterized by characteristics of stress nor by characteristics of spontaneity." Finally, he concluded that in the journal written for Detective Strasser, "the characteristics of stress dominate versus the characteristics of spontaneity." Matley admitted that he could determine whether a writing showed signs of being written under stress, but he could not determine whether duress was the cause of the stress.

In further argument on the admissibility of Matley's proposed testimony, defense counsel argued that "he's clearly within accepted expert boundaries to be able to testify that this type of writing has these characteristics showing stress," and "a comparison" showing that "[t]his particular writing was written under more stress than this one, or this one under less stress" "is still of great value to the [jury.]"

The court ultimately determined that while Matley had "some expertise" in the area of handwriting stress analysis, his testimony would "not assist the jury in any material way sufficient to warrant his testimony," and consequently the court ruled Matley would not testify.

In his new trial motion, [Hamlin] argued that the court had erred in excluding Matley's testimony. In denying that aspect of [Hamlin's] motion, the court explained that "in essence, in substance, [the court] was making a[n Evidence Code section] 352 ruling in" excluding Matley's testimony. The court asserted that the probative value of Matley's proposed testimony was weak because Matley could not "say whether duress was the cause of the stress" that might have been reflected in S.'s writing, and thus his testimony about all the factors that go into determining whether someone is writing under stress would have "occup[ied] undue consumption of time and distract[ed] the jury on irrelevant issues."

On appeal, [Hamlin] contends that "[t]he court erred in refusing to permit [Matley] to testify concerning handwriting stress analysis" because his testimony "would have been relevant and highly probative." We find no error.[47]

In rejecting Hamlin's contentions, the Court of Appeal held:

"In determining whether to admit expert testimony, the trial court has broad discretion, and we may not interfere with that discretion unless it is clearly abused." (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196, 103 Cal.Rptr.2d 908.) Indeed, "an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence," including a ruling under Evidence Code section 352. (*People v. Waidla* (2000) 22 Cal.4th 690, 724, 94 Cal.Rptr.2d 396, 996 P.2d 46.)

Here, as the trial court explained in ruling on [Hamlin's] new trial motion, the court excluded Matley's testimony because the court determined that whatever probative value Matley's testimony might have was outweighed by other factors cognizable under Evidence Code section 352, namely, "undue consumption of time and distract[ ion of] the jury on irrelevant issues." (See Evid.Code, § 352.) We find no abuse of discretion in that ruling. The trial court reasonably determined that Matley's testimony would have little probative value because while Matley could testify that certain writings by S. showed or did not show signs of having been written under stress, he could not "say whether duress was the cause of the stress." Weighed against that small probative value was the "undue consumption of time" the court concluded would be required for Matley to testify about all the factors that go into determining whether someone is writing under stress.

"'[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking."' [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658, 14 Cal.Rptr.3d 534.) Here, [Hamlin] has failed to demonstrate the court's ruling excluding Matley's testimony exceeded the bounds of reason. Accordingly, no abuse of discretion has been shown.

As for [Hamlin's] suggestion that the trial court's ruling violated his federal constitutional rights, the following passage suffices to answer that suggestion: "Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense [citation]; certainly the marginal probative value of this evidence does not take it outside the general rule." (*People v. Snow* (2003) 30 Cal.4th 43, 90, 132 Cal.Rptr.2d 271, 65 P.3d 749.).[48]

---

[47] *Hamlin*, 89 Cal. Rptr.2d at 431-32.

[48] *Id.* at 432.

22

It is well-settled law that a criminal defendant has a constitutional right to present a defense.[49]  This right is not, however, unfettered or without limitation.  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."[50]  This latitude, however, has limits.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"[51]  This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"[52]  The Constitution clearly "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."[53]   In this context, the Supreme Court has repetitively held that the Constitution permits judges "to exclude evidence

---

[49] *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

[50] *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, (1983); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967).

[51] *Crane,* 476 U.S. at 690 (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984).

[52] *Scheffer,* 523 U.S. at 308 (quoting *Rock v. Arkansas,* 483 U.S. 44, 58, 56 (1987)).

[53] *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (citing Fed. R. Evid. 403 as an example).

that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[54]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."[55]  California employs a similar rule.[56]

Like California, the decision of the trial court on the admissibility of an expert opinion is reviewed for abuse of discretion.[57]  Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[58] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[59]  Because he fails

---

[54] *Crane,* 476 U.S. at 689-690 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)) (ellipsis and brackets in original); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

[55] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

[56] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("[w]e review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

[57] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

[58] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

[59] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under

to present a question of constitutional dimension, Hamlin is not entitled to relief under his fourth ground.

V.  CONCLUSION AND ORDER

Hamlin is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is also **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[60]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[61]

The Clerk of the Court is to enter judgment accordingly.

Dated:  December 14, 2012.

/s/ James K. Singleton, Jr.<br>JAMES K. SINGLETON, JR.<br>United States District Judge

---

AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law. § 2254(d)(1)").

[60] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[61] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.